# STATE OF CONNECTICUT *v.* DAN L. MOORE
## (SC 17992)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 19—officially released November 3, 2009

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Edward R. Narus*, senior assistant state's attorney, for the appellant (state).

*Pamela S. Nagy*, special public defender, for the appellee (defendant).

*Opinion*

ZARELLA, J. The state appeals, following our grant of certification, from the judgment of the Appellate Court reversing the conviction of the defendant, Dan L. Moore, of three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), four counts of attempt to commit robbery in the first degree in violation of § 53a-134 (a) (4) and General Statutes § 53a-49 (a), and one count of conspiracy to commit robbery in the first degree in violation of § 53a-134 (a) (4) and General Statutes § 53a-48 (a). The state claims that the Appellate Court improperly concluded that the defendant's sixth amendment right of confrontation[1]

---

[1] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

The sixth amendment right of confrontation is made applicable to state prosecutions through the due process clause of the fourteenth amendment to the United States constitution. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

under the United States constitution was violated when the trial court denied his motion to strike certain testimony that the state elicited during its redirect examination of James Brooks, a participant in the robbery and a prosecution witness who invoked his fifth amendment privilege against self-incrimination[2] before the assistant state's attorney (prosecutor) completed his redirect examination, thus depriving the defense of the opportunity to question Brooks on recross-examination. The defendant responds that the Appellate Court properly concluded that his right of confrontation was violated when the trial court denied his motion to strike. The defendant further maintains that, if this court concludes otherwise, the Appellate Court's judgment may be affirmed on the alternative grounds that (1) the trial court improperly allowed Brooks to invoke his fifth amendment privilege after he had waived the privilege by agreeing to testify, (2) the prosecutor committed improprieties during his direct and redirect examination of Brooks and during his closing argument that deprived the defendant of his right to a fair trial, and (3) the trial court improperly failed to give the jury a cautionary instruction on accomplice testimony.[3] We agree with the state, reject the defendant's alternative grounds for affirmance and, accordingly, reverse the judgment of the Appellate Court.

---

[2] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

The fifth amendment privilege against self-incrimination is made applicable to state prosecutions through the due process clause of the fourteenth amendment to the United States constitution. *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

[3] The defendant properly raised these three alternative grounds for affirmance in his preliminary statement of the issues pursuant to Practice Book § 84-11 (a), which provides in relevant part: "Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. . . ."

The following relevant facts and procedural history are set forth in the opinion of the Appellate Court. "The defendant was charged in connection with a robbery that occurred on October 6, 2002, in Windsor. A group of seven individuals was . . . in the parking lot of the Ranch House restaurant when a dark blue minivan was driven adjacent to them. Several men got out of the van, and the driver, Corey Wallace, remained inside the van.[4] One of the men, Brooks, pointed a shotgun at the group while another, Andrew Cromwell, searched them. One witness testified that a third person stood near the van and told the victims to cooperate. After all seven individuals were searched, the men got back inside the van, threw two of the victims' wallets out a window and drove away. In total, approximately $30, a silver necklace and a cellular telephone were stolen.

"The victims immediately called 911 to report the robbery and the license plate number of the van. Shortly after the robbery was reported, a Hartford police officer saw the van as it stopped near Main and Sanford Streets in Hartford. The driver, Wallace, ignored police efforts to stop the van, instead leading police from four different police departments on a high speed chase until the van eventually was brought to a stop on Interstate 84. Brooks, Cromwell, Wallace and the defendant were detained and arrested.

"Later that night at the Windsor police station, the seven victims viewed photographic arrays containing photographs of Brooks, Wallace, Cromwell and the defendant. Three victims identified Brooks as the gunman. One victim identified Cromwell as an assailant.

---

[1] Of the seven victims, two testified that two men got out of the van, one testified that two or three men got out of the van, three testified that three men got out of the van, and one testified that three or four men got out of the van. Two of the victims also testified that they had seen a driver who remained in the van during the robbery, and all of the victims testified that the men who had exited from the van did so from the passenger side.

None of the victims identified Wallace. One victim iden-
tified the defendant, but he stated that he thought the
defendant was the driver.

"At trial, Brooks, Cromwell and Wallace testified
against the defendant pursuant to plea agreements. On
direct examination, Brooks testified that the defendant
was present during the robbery and at some point got
out of the van to pick up a wallet that Cromwell had
taken from a victim and thrown on the ground. He also
testified that the defendant threw the wallet out of the
van as they drove away. This testimony generally was
consistent with testimony given by the victims and by
Wallace and Cromwell, although Brooks' overall depic-
tion of the evening's events varied from the testimony
of others in several respects.

"On cross-examination, Brooks changed his testi-
mony. He testified that the defendant had been dropped
off at a nightclub, Club Pyramid, prior to the robbery
and was picked up after the robbery.[5] Brooks testified
that he was encouraged to implicate the defendant in
order to get a favorable plea agreement. On redirect
examination, the [prosecutor] questioned Brooks about
the details of his plea proceedings, including his dia-
logue with the court, *Miano, J.*, during the plea proceed-
ings, and the facts to which Brooks had agreed to testify.
The [prosecutor] also asked Brooks about a conversa-
tion he had had with the prosecutor about going to
trial.[6] Prior to the conclusion of redirect examination,
Brooks invoked his fifth amendment right and refused
to testify further, precluding any opportunity for

[5] Brooks initially testified on cross-examination, however, that the defen-
dant had accompanied the other participants to the scene of the crime,
gotten out of the van and, during the time that Brooks was pointing a shotgun
at the victims, picked up a wallet that one of the victims had thrown on
the ground, opened it and threw it back on the ground.

[6] This conversation with the prosecutor occurred after Brooks entered
his plea but before the defendant's trial.

recross-examination by the [defense]."[7] *State* v. *Moore*, 103 Conn. App. 1, 3–6, 926 A.2d 1058 (2007).

After Brooks invoked his fifth amendment privilege, defense counsel moved to strike his redirect testimony from the record. In urging the court to grant the motion, defense counsel repeatedly argued that, although she had cross-examined Brooks following his testimony on direct examination and had done so "fully," her lack of an opportunity to recross-examine Brooks following his redirect testimony was prejudicial.[8] The defense was especially concerned about the effect of Brooks' testimony that he had taken an oath to tell the truth on the jurors. Defense counsel also explained that she wanted to rehabilitate Brooks because the prosecutor had been given two opportunities to question him, whereas she had been given only one, thus making Brooks "appear to be a liar throughout what he's done." The prosecutor responded that Brooks' testimony on redirect examination was merely a repetition of his earlier testimony regarding the facts and the plea to which he had agreed. Thus, the redirect testimony did not add anything new for the jury to consider. The prosecutor also argued that Brooks' testimony on cross-examination already had shown him to be a liar and that the defense could do nothing to change that fact.

---

[7] In response to a query by the court, Brooks stated that he understood that his plea agreement could be rejected and that he could be charged with perjury as a consequence of his decision.

[8] Defense counsel argued that Brooks' redirect examination testimony provided "fruitful ground" for recross-examination on several matters, including his apparent agreement with facts implicating the defendant in the crime in order to get the benefit of a plea bargain, his potential intimidation when questioned by Judge Miano during the plea hearing and his testimony that he had agreed to facts that were not necessarily true. Defense counsel also argued several times that Brooks' invocation of his privilege against self-incrimination had resulted in the defense being "cut off from the possibility of questioning him on [recross-examination]" and being denied the opportunity for recross-examination.

In denying the motion to strike, the court, *Espinosa, J.,* stated: "[A] small portion of redirect [examination] goes to the impeachment of the witness' credibility, a collateral issue, and not regarding the matters directly related to the crimes charged. Defense [counsel] had an ample opportunity to cross-examine [Brooks] about the crimes charged and, indeed, elicited testimony exculpating the defendant.

"The facts of the plea on January 27, 2005, [were] brought up on direct examination, and inconsistencies between [Brooks'] in-court testimony . . . were pointed out on direct examination, [and] there are several instances in the testimony where . . . Brooks' plea was . . . mentioned. So . . . defense [counsel] had an opportunity to cross-examine [Brooks] about that plea on cross-examination. If . . . defense [counsel] did not do that, well, that was up to the defense.

"But, in any event, the court finds that, because the issues brought up on redirect [examination] go only to the credibility of the witness . . . it will not be excluded." When the jurors returned to the courtroom, the court instructed that the testimony of Brooks had concluded and that the jurors were not to speculate as to the reason why he did not testify further. The jury subsequently found the defendant guilty of three counts of robbery in the first degree, four counts of attempt to commit robbery in the first degree and one count of conspiracy to commit robbery in the first degree. Although defense counsel moved for a mistrial, the trial court denied the motion for the same reasons that it had denied the motion to strike.

On appeal to the Appellate Court, the defendant claimed that the trial court improperly had denied the motion to strike Brooks' redirect testimony. He specifically claimed that, because the defense had not been given an opportunity to question Brooks about new

issues raised on redirect examination, he had been deprived of his sixth amendment right of confrontation. See *State* v. *Moore*, supra, 103 Conn. App. 6. The Appellate Court agreed, stating: "On redirect examination, the state raised new issues that had not been explored during direct examination, including Brooks' dialogue with Judge Miano at the plea canvass and a conversation between Brooks and [the] prosecutor regarding the plea. The defendant's inability to recross-examine the witness, therefore, is no different from a situation in which cross-examination has been precluded." Id., 7. The court also explained that "[t]he issues raised during the state's redirect examination of Brooks were not collateral matters"; id., 8; and that Brooks' assertion of his fifth amendment privilege had prevented the defense from inquiring further into the details of Brooks' redirect testimony. Id., 10. As a result, the defense was unable to test the truth of Brooks' testimony regarding his conversation with Judge Miano at the plea hearing and his subsequent, pretrial conversation with the prosecutor. Id. The court finally concluded that the error was not harmless because Brooks' exculpatory testimony was important to the defendant's case and the only direct evidence linking the defendant to the robbery was the testimony of the accomplices. Id., 10–11. Thus, the Appellate Court reversed the trial court's judgment and remanded the case for a new trial. Id., 11.

We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the trial court abused its discretion by refusing to strike the state's redirect examination of [Brooks], and, if so, was the impropriety harmless error?" *State* v. *Moore*, 284 Conn. 927, 934 A.2d 243 (2007).

I

The state claims that the Appellate Court improperly reversed the defendant's conviction on the ground that

his sixth amendment right of confrontation was violated when the trial court denied the motion to strike Brooks' testimony on redirect examination. The state specifically claims that the reversal was improper because (1) the defense had an opportunity to explore the issues raised in Brooks' redirect testimony during its earlier cross-examination of Brooks but chose not to do so, (2) the state's redirect examination was limited in scope, (3) the Appellate Court failed to consider the effect of the redirect testimony in the context of Brooks' other testimony, and (4) the state's redirect examination was its only opportunity to challenge Brooks' exculpatory testimony, which he first proffered during cross-examination. The defendant responds that Brooks' redirect testimony did not involve collateral matters and that defense counsel's inability to question Brooks on recross-examination prevented her from testing the truth of the redirect testimony, thus necessitating that that testimony be stricken. We conclude that the defendant's right of confrontation was not violated when the trial court denied his motion to strike.

We begin our analysis by setting forth the standard of review. "[I]n . . . matters pertaining to control over cross-examination, a considerable latitude of discretion is allowed. . . . The determination of whether a matter is relevant or collateral, and the scope and extent of cross-examination of a witness, generally rests within the sound discretion of the trial court. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"The court's discretion, however, comes into play only *after* the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment [to the United States constitution]." (Emphasis added; internal quotation marks omitted.) *State* v. *Osimanti*, 111 Conn. App. 700, 707–708, 962 A.2d 129 (2008), cert.

granted, 290 Conn. 914, 965 A.2d 554 (2009); see also *State* v. *Francis*, 267 Conn. 162, 181, 836 A.2d 1191 (2003) ("restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment" [internal quotation marks omitted]). Accordingly, we first examine whether the defendant's sixth amendment right of confrontation was violated and then consider whether the trial court abused its discretion in denying the motion to strike.

"[T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Additionally, [a]lthough it is within the trial court's discretion to determine the extent of cross-examination . . . the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . The right of confrontation is preserved [however] if defense counsel is permitted to expose to the [jurors] the facts from which [they], as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 81–82, 890 A.2d 474, cert.

denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

"If a defendant's cross-examination is restricted by the competing fifth amendment right of a witness, it may be necessary to strike the direct testimony of that witness." (Internal quotation marks omitted.) *State* v. *Roma*, 199 Conn. 110, 116, 505 A.2d 717 (1986). "[T]he sixth amendment is violated only when assertion of the privilege undermines the defendant's opportunity to test the truth of the witness' direct testimony." *Bagby* v. *Kuhlman*, 932 F.2d 131, 135 (2d Cir.), cert. denied, 502 U.S. 926, 112 S. Ct. 341, 116 L. Ed. 2d 281 (1991). "To reconcile a defendant's rights under the confrontation clause with a witness' assertion of the fifth amendment privilege, a court must initially consider: (1) whether the matter about which the witness refuses to testify is collateral to his or her direct testimony, and (2) whether the assertion of the privilege precludes inquiry into the details of his or her direct testimony. . . . If the court determines that the privilege has been invoked with respect to a collateral matter, or that the invocation does not preclude inquiry into the witness' direct testimony, then the defendant's right to cross-examine has not been impinged and no corrective action is necessary. Conversely, the sixth amendment is violated when a witness asserts the privilege with respect to a non-collateral matter and the defendant is deprived of a meaningful opportunity to test the truth of the witness' direct testimony." (Citations omitted.) Id.; see also, e.g., *United States* v. *Newman*, 490 F.2d 139, 145 (3d Cir. 1974); *Fountain* v. *United States*, 384 F.2d 624, 627–28 (5th Cir. 1967), cert. denied sub nom. *Marshall* v. *United States*, 390 U.S. 1005, 88 S. Ct. 1246, 20 L. Ed. 2d 105 (1968); *United States* v. *Smith*, 342 F.2d 525, 527 (4th Cir.), cert. denied, 381 U.S. 913, 85 S. Ct. 1535, 14 L. Ed. 2d 434 (1965); cf. *State* v. *Valeriano*, 191 Conn. 659, 666–67, 468 A.2d 936 (1983) ("extreme sanction" of

striking witness' testimony should be imposed only when invocation of fifth amendment privilege "blocks inquiry into matters directly relating to the crime charged and not those which are merely collateral matters" because, when privilege is invoked as to purely collateral matters, "there is little danger of prejudice to the defendant" [internal quotation marks omitted]), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984). "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." *State* v. *Roma,* supra, 116; accord *State* v. *Brown,* 273 Conn. 330, 340, 869 A.2d 1224 (2005).

We conclude that Brooks' assertion of his fifth amendment privilege did not preclude inquiry into the details of his redirect testimony because he had been queried on direct and cross-examination regarding all of the matters that the prosecutor raised on redirect examination. Brooks testified on direct examination that the defendant had been present during the robbery and that he had exited the van, picked up a wallet belonging to one of the victims and subsequently tossed it out the window as the van drove away. Brooks also testified that he did not recall telling the prosecutor or Judge Miano that all four men had agreed to participate in the robbery[9] or that the defendant had known that the

---

[9] The prosecutor asked Brooks the following questions on direct examination:

"Q. Okay. Do you remember telling me the other day that all of you just sort of agreed to do a robbery after this discussion developed?

"A. Um, I don't remember telling you that.

"Q. Do you remember saying that the conversation just sort of came up?

"A. Right.

"Q. And a discussion about robbing somebody came up, and all of the people in the van decided to do this? Do you remember saying that?

"A. I don't remember saying that.

"Q. Okay. And [your attorney] was present when we were talking to you at the time? Do you recall that?

"A. I don't recall all that. I don't remember saying exactly that he knew that we [were] going to do this robbery.

"Q. Well, that's my question. Do you recall saying that to me, that everybody in the van, at that time, decided they would do this robbery, all of you?

"A. I said I don't remember saying that.

"Q. Okay. Do you remember saying that to Judge Miano on January 27 of 2005, and describing what occurred that evening?

"A. No. I never said that he knew at the time what we [were] talking about, if it was happening.

"Q. Well, did there come a time . . . when [the defendant] agreed to participate in a robbery of some people?

"A. He never agreed, but he was just there, present, because he was caught in it.

*  *  *

"Q. Well, my question is, at some point, did [the defendant] recognize that you and Mr. Cromwell were going to do an armed robbery utilizing the shotgun?

"A. When it happened—

"Q. —that you had in the van?

"A. When it happened.

"Q. So he never had any knowledge that you were going to do this until it happened?

"A. Right.

"Q. Is that what you're saying?

"A. Right.

"Q. And is that what you told Judge Miano?

"A. Uh-huh.

"Q. On January 27?

"A. Yeah.

*  *  *

"Q. Mr. Brooks, do you recall on January 27, you entered some pleas with regard to your participation in this robbery? Do you recall that?

*  *  *

"A. Uh-huh.

"Q. And during the course of that plea, the court asked me to recite essentially what happened during the incident. And at one point, I indicated . . . there was a discussion in the van about committ[ing] a robbery to obtain money, that this discussion was held amongst the four of them, being you, [the defendant], Mr. Cromwell, and Mr. Wallace?

"A. Well, I didn't hear when you said that. If that's what's written down, then that's what was said.

*  *  *

"Q. Well, isn't it true in the plea that you made with Judge Miano on January 27 that you agreed that everybody in the van knew there was going to be a robbery of those individuals?

"A. All right. Well, if it's in there, then that's what happened. Everybody knew. Everybody knew.

other three men were planning to commit the robbery. When specifically questioned, however, about facts in the plea indicating otherwise, he conceded that, "[i]f that's what's written down, then that's what was said." In the same context, Brooks also conceded that "[e]verybody [in the group] knew" about the plan to commit the robbery.

On cross-examination, defense counsel observed that Brooks appeared to admit on direct examination that he had agreed in his plea that the defendant had been present during the robbery. Brooks concurred, testifying that he had told Judge Miano when he entered his plea that the defendant had been present, but added that he initially said that the defendant had not been present. Following continued questioning regarding the details of the robbery, Brooks reiterated that the defendant had been present. When defense counsel persisted in asking several additional questions regarding the defendant, however, Brooks complained: "I'm . . . really tired of hearing about [the defendant]. But, like I said from the beginning, I'm going to tell the truth like the judge said . . . earlier. [The defendant] wasn't nowhere around. [The defendant] wasn't there. I just— when I took my plea, it was like they wanted me to implicate somebody [who] was going to trial instead of us three [who were] already pleading out . . . . I don't know the whole situation. But he wasn't there. That's it." Brooks then acknowledged that he was under oath and reiterated at the end of his cross-examination testimony that the defendant had not been present during the robbery.

---

"Q. Well, is that something that you agree with? Whether you said to Judge Miano—

"A. I agree with it. I agree with it. Whatever. I agree with it."

Defense counsel raised no objections to this testimony.

On redirect examination, the prosecutor queried Brooks about all of the same matters.[10] First, he asked

---

[10] After asking Brooks several times if he had agreed to tell the truth during his testimony at trial by taking an oath and by swearing to tell the truth, the prosecutor asked him the following additional questions on redirect examination:

"Q. But you were telling the truth yesterday [during direct examination], correct?

"A. (No response)

"Q. And you were telling the truth back on January 27 of 2005?

"A. Right.

"Q. —when you entered a plea and Judge Miano asked you what occurred that evening?

"A. Right.

"Q. You're saying to this jury that you lied to Judge Miano?

"A. I didn't lie to him. I told him—

"Q. Listen to the question.

"A. —that it wasn't, that [the defendant] wasn't there.

"Q. Are you saying that you lied to Judge Miano when you told him, during the course of your plea, truthfully, when he asked you [whether the defendant] was present, [whether the defendant] got out of the vehicle when you had the shotgun pointed at individuals and Mr. Cromwell is searching people and, in fact, took a wallet that was tossed over to him and took that wallet and went in the van? Is that a lie that you told to Judge Miano?

"A. That's what I agreed upon.

"Q. That's not my question. Judge Miano asked you to tell the truth, did he not?

"A. Yes.

"Q. And he said, 'in your own words, as truthfully as you could be, say what happened,' correct?

"A. Right.

"Q. And that was one of the things you told Judge Miano, that the four of you drove up, and a robbery occurred, and [the defendant] got out of the van, picked up that wallet, got into the van, and tossed it out? You told [the] judge that [the defendant] was there during the robbery, correct?

"A. Yes.

* * *

"Q. And when I indicated to Judge Miano, at the time of your plea, that [the defendant] was present in the van with you, Mr. Cromwell, and Mr. Wallace was driving, and a discussion took place where it was agreed upon to rob some individuals in that parking lot, and the van did turn around and approach those individuals, and you got out and [the defendant] was present, you agreed with the facts that I expressed to the court [and that they were] the basis for the crime that you were pleading guilty to, correct?

"A. Yes, I agreed.

"Q. And part of that crime was conspiracy to commit robbery, [and that] was that you and others had an agreement to go and rob individuals?

"A. Right.

"Q. Is that correct?

"A. Right.

"Q. And you agreed to that factual basis as part of the conviction for conspiring to commit the robbery, correct?

"A. Right.

"Q. Do you recall Judge Miano indicating to you and asking you certain questions about your plea? He said, 'Sir, I'm going to ask you some questions, there's no rush. I want you to make sure you understand everything, 100 percent. If there is something you don't understand, no matter how small or trivial it might appear, I want you to feel free to interrupt me and either consult with your attorney . . . who is seated there in the courtroom, and or interrupt me and ask me to explain it more clearly. All right, sir?'

"A. Yes.

"Q. And he asked you about the crime of robbery and the facts that I alleged constitute it, and you agreed with those facts?

"A. Yes.

"Q. And he asked you [that] if you had any thoughts or concerns or questions, that you should interrupt him?

"A. Yes.

"Q. And you never interrupted him and said, 'Oh, I'm sorry . . . . What [the prosecutor] says is not correct because [the defendant] wasn't there at all.' You never said that to the judge, did you?

"A. I said it in the beginning.

"Q. In the beginning where?

"A. When you called me down there that day to talk to me, before I even went in front of the—um, whatever—it was [indicated] that if I was called upon—so, I'm not thinking that I'm going to be called to testify against this man, and, and, and lie, so I just agreed with whatever was said.

\* \* \*

"Q. Mr. Brooks, isn't it true that you and I never spoke until after your plea was entered?

"A. Right.

"Q. On January 27?

"A. Right.

"Q. And Judge Miano indicated that, as a part of that plea, you would continue to express the factual basis of your plea, including testifying against [the defendant], and, after doing that and [after] he accepted that plea and continued the case for sentencing, it was only at that point in time that you and I ever discussed anything about what you would particularly testify to in this trial? Is that correct?

"A. Right.

"Q. And your lawyer . . . was there at the time?

"A. Right.

"Q. And my inspector . . . was there?

"A. Right.

"Q. Correct?

"A. Right.

"Q. And we had a discussion, and, at that time, we said to you, 'We only want you to recall and say what you recalled as truthfully as you can without

if Brooks had agreed to tell the truth when he entered his plea. He then asked if Brooks had lied when he told Judge Miano that the defendant had been present during the robbery and had gotten out of the van, picked up a wallet from the ground and gotten back into the van. Next, he asked if Brooks had agreed with the facts in the plea indicating that the defendant had agreed to participate in the robbery and if Brooks ever had stated that the factual basis for his plea was incorrect because the defendant had not been present. He finally asked if Brooks had agreed in his conversation with the prosecutor to tell the truth at trial in accordance with the facts in his plea.

As this court emphasized in *State* v. *Reed,* 174 Conn. 287, 386 A.2d 243 (1978), "[t]he decision whether to cross-examine a witness is almost always a . . . tactical one. . . . When a party chooses not to cross-examine a witness in order to avoid the possibility of eliciting harmful testimony, his right to confront and cross-examine that witness as guaranteed by the sixth and fourteenth amendments of the United States constitution is in no way abridged." (Internal quotation marks

us putting any words in your mouth or telling you what to say.' Do you recall that?

"A. Yes.

"Q. And you recall saying, there, with our attorney, in front of us, that that's exactly what you were doing and that's what you were going to do? Remember saying that to us?

\* \* \*

"A. I remember saying, um—telling you what was happening, and you, being the good [prosecutor] that you are, just kept asking the same question and question. So I gave you what you wanted to hear.

"Q. Excuse me. Did you ever tell or say, at that conference, that I'm just going to tell you whatever you want to hear . . . ?

"A. No.

"Q. No, [you] never said that. In fact, during the course of our discussions, isn't it true we had a discussion about [the defendant] going to trial on these factual bases with the evidence that the state had?

"A. Right.

"Q. And didn't you express concern about [the defendant] going to trial based on the evidence, including your testimony that was anticipated to say he was there during the robbery and participated? Do you remember that?

omitted.) Id., 300. In the present case, we conclude that, because the same issues were raised on direct and redirect examination, the defense had an adequate opportunity to query Brooks on cross-examination.

The defendant argues that new matters were raised on redirect examination pertaining to the crimes charged and that the defense had no opportunity to explore them. He contends that these new matters consisted of details of Brooks' plea agreement and conversation with the prosecutor that had not been covered on direct examination. The defendant specifically argues that the new details included information that Brooks (1) had not lied to Judge Miano, (2) had told Judge Miano that the defendant had gotten out of the van, picked up a wallet from the ground, gotten back into the van and tossed the wallet back out of the van, (3) had not spoken with the prosecutor until after he entered his plea, and (4) had told the prosecutor that he was concerned about the defendant going to trial and about his own anticipated testimony that the defendant had been present during the robbery. The defendant further contends that the defense wanted to recross-examine Brooks to remove the inference raised on redirect examination that Brooks previously had not told Judge Miano or the prosecutor that the defendant had not been present at the robbery and to examine whether and to what extent Brooks felt pressured to testify as he did. We do not agree that the defense had no prior opportunity to question Brooks about these matters.[11]

"[When] . . . new matter is brought out on redirect examination, the defendant's first opportunity to test

---

"A. I remember that and I—Your Honor, can I talk to you?"

[11] We do not address the parties' dispute as to whether the Appellate Court properly concluded that the federal constitution is violated whenever the state presents "material new matters" on redirect examination and the defendant is not allowed to engage in recross-examination on such matters; (internal quotation marks omitted) State v. Moore, supra, 103 Conn. App. 6–7; because we conclude that no new matters were presented.

the truthfulness, accuracy, and completeness of that testimony is on recross examination. . . . To deny recross examination on matter first drawn out on redirect is to deny the defendant the right of any cross-examination as to that new matter." (Citations omitted.) *United States* v. *Caudle*, 606 F.2d 451, 458 (4th Cir. 1979).

Although there were minor differences between Brooks' redirect testimony and his earlier testimony on direct and cross-examination, his testimony on all three occasions related to the factual basis for his plea, his obligation to tell the truth when he entered his plea, his conversation with the prosecutor and his perception that others may have wanted him to testify against the defendant. The problem is not that the defense did not have the opportunity to address these matters on recross-examination but that it failed to take advantage of the opportunities presented during cross-examination to query Brooks further.

For example, the defense could have sought testimony from Brooks on cross-examination regarding his perception that others wanted him to testify against the defendant following his statement that, at the time he entered his plea, it had seemed like "they [had] wanted [him] to implicate somebody [who] was going to trial instead of us three [who were] already pleading out . . . ." Instead of asking Brooks to explain what he meant by feeling pressured to "implicate" someone who was going to trial and his possible loyalty to the defendant, however, the defense ignored this testimony, merely asking if Brooks understood that he was testifying under oath. Brooks also testified on direct examination about his conversation with the prosecutor before the defendant's trial, but the defense did not ask Brooks on cross-examination what Brooks and the prosecutor had discussed and when the discussion took place, instead choosing not to pursue the matter. Finally, Brooks' cross-examination testimony that

"they" wanted him to implicate the defendant in the robbery and his subsequent testimony that the defendant had not been present opened the door to questions regarding whether Brooks had lied to Judge Miano and the details of his conversations with the judge and the prosecutor, which the defense failed to ask. Consequently, we cannot conclude that the defense did not have an adequate opportunity during cross-examination to address the same matters that the prosecutor raised during his redirect examination of Brooks.

The defendant contends that the present case is similar to *United States* v. *Caudle*, supra, 606 F.2d 458–59, and *Kelly* v. *State*, 842 So. 2d 223, 226 (Fla. App. 2003), in which each court concluded that it was reversible error to deny the defendant the opportunity to recross-examine a witness because the matters raised on redirect examination were new. We disagree because those cases are factually distinguishable.

In *Caudle*, one of the principal issues at trial was the authorship of a feasibility study submitted in connection with a federal loan application. *United States* v. *Caudle*, supra, 606 F.2d 455. On redirect examination, the prosecutor took the witness through a page-by-page examination of the study to determine which part of each page represented the witness' original work. Id. When counsel for the defendants sought to take the witness through a similar page-by-page examination during recross-examination, the District Court sustained the prosecutor's objection on the ground that the recross-examination would be repetitive. Id., 456. The Fourth Circuit Court of Appeals concluded, however, that the District Court improperly had denied the defendants their right to recross-examine the witness. Id., 458–59. The court determined that, because the witness had testified on direct and cross-examination that the defendants had supplemented his work with additional information and had actually compiled the study, the question of who had prepared the study was

in doubt at the end of the cross-examination. Id., 455. Thus, the witness' explanation on redirect examination as to which parts of the study represented his original work constituted new matter that was far more detailed than his prior testimony. See id., 455, 458. As a result, the Fourth Circuit concluded that the defendants had been denied the opportunity to test the truthfulness of the witness' testimony on redirect examination. Id., 458–59.

We conclude that *Caudle* is inapposite because the information disclosed on redirect examination in that case consisted of a large body of new material that was crucial in resolving the central issue of the case, namely, who had authored various portions of the feasibility study. See id., 455, 458. In contrast, Brooks' testimony on redirect examination that he had not lied to Judge Miano and that he had acknowledged certain details at his plea hearing regarding the defendant's participation in the robbery did not raise any new issues that could not have been explored on cross-examination in response to Brooks' direct testimony. The defense also could have queried Brooks on cross-examination regarding the details of his conversation with the prosecutor because the fact that such a conversation took place had been elicited during Brooks' direct testimony.

Similarly, in *Kelly* v. *State*, supra, 842 So. 2d 223, a Florida appeals court concluded that the trial court improperly had denied the defendant her right to recross-examine a witness regarding critical information elicited for the first time on redirect examination. Id., 224. During cross-examination, a police officer testified that his report indicated that a third party had admitted to shooting the murder weapon, but the officer then testified on redirect examination that his report did not state that he had had a conversation with that third party. Id., 225. The trial court subsequently declined to allow recross-examination of the officer on this matter. Id., 225–26. The appeals court concluded,

however, that, because the officer's redirect testimony conflicted with his testimony on cross-examination, the trial court improperly had denied the defendant an opportunity to confront the officer regarding the inconsistency. Id., 226.

We conclude that *Kelly* also is inapplicable in the present context because the redirect testimony in that case was completely new and conflicted with the testimony that the police officer had given on cross-examination. Id., 225–26. In the present case, however, Brooks' redirect testimony was consistent with his earlier testimony and merely illuminated a few minor details. Consequently, *Kelly* is factually distinguishable.

On the basis of our determination that Brooks' assertion of his fifth amendment privilege did not prevent the defense from inquiring into the issues raised on redirect examination because the same issues had been raised on direct and cross-examination, we conclude that the defendant's right of confrontation was not violated.

We next consider the certified issue of whether the trial court abused its discretion in denying the motion to strike Brooks' redirect testimony. "Once [a] defendant has been permitted cross-examination sufficient to satisfy the sixth amendment, restrictions on the scope of cross-examination are within the sound discretion of the trial judge." *State* v. *Valentine*, 240 Conn. 395, 407–408, 692 A.2d 727 (1997). In the present case, the parties did not address in their briefs to this court whether the trial court abused its discretion but confined their arguments to the constitutional question of whether the defendant was deprived of his sixth amendment right of confrontation.[12] Accordingly, in light of our determination that there was no constitutional violation, there is no basis for concluding that the trial

---

[12] We also note that the parties did not address the issue in their briefs to the Appellate Court.

court abused its discretion in declining to strike Brooks' redirect testimony. We thus agree with the state that the Appellate Court improperly reversed the defendant's conviction on the ground that the trial court improperly had denied the motion to strike.[13]

## II

The defendant presents three alternative grounds on which the Appellate Court's judgment may be affirmed. First, the defendant argues that the trial court improperly allowed Brooks to invoke his fifth amendment privilege after he waived it by agreeing to testify. Second, the defendant argues that the prosecutor committed certain improprieties during his direct and redirect examination of Brooks and during his closing argument and that these improprieties deprived the defendant of a fair trial. Third, the defendant contends that the trial court improperly failed to give the jury a cautionary instruction on accomplice testimony. We examine each ground in turn.

## A

The defendant first claims that Brooks waived his fifth amendment privilege by testifying about the details of the robbery on direct and cross-examination, and, therefore, the trial court should have compelled him to continue his testimony. The defendant also claims that the trial court's failure to take such measures constituted harmful error and a ground for affirming the judgment of the Appellate Court. The state responds that the

---

[13] The dissent argues that, although the state might have suffered harm if the trial court had granted the motion to strike, the risk of prejudice arising out of the decision of the state's own witness to assert his fifth amendment privilege in the middle of his testimony should lie with the state. See footnote 3 of the dissenting opinion. The question before this court, however, is not whether granting the defendant's motion to strike Brooks' redirect examination testimony would have been unfairly prejudicial to the state but whether the defendant's sixth amendment right of confrontation was violated when the court denied the motion to strike. Thus, the dissent's argument is irrelevant in light of our conclusion that the defendant's right of confrontation was not violated because no new issues were raised on redirect examination that the defense could not have explored during its cross-examination of Brooks.

defendant's claim was not properly preserved because defense counsel did not object when Brooks invoked the privilege. The state further argues that, because the record strongly suggests that the defense made a strategic decision not to ask the trial court to disallow Brooks' invocation of the privilege and to require that he submit to further questioning on redirect examination, the defendant's claim should not be considered under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The state finally argues that, if this court decides to consider the claim, it must fail under *Golding*. We conclude that, even if the trial court improperly allowed Brooks to invoke his fifth amendment privilege, the impropriety was not harmful because the defendant's right of confrontation was not substantially impaired.[14]

A defendant can prevail on an unpreserved constitutional claim under *Golding* "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Assuming, without deciding, that Brooks improperly was allowed to invoke his fifth amendment privilege,

[14] In light of the harmful error analysis that follows, it is unnecessary to consider the state's claim that the defense made a strategic choice not to object when Brooks invoked his privilege against self-incrimination.

we conclude that the trial court's failure to compel Brooks to testify further was harmless error. "It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . and only if the error was not harmless may the defendant prevail on his *Golding* claim. . . . The state bears the burden of proving that the error is harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 993 (2008).

In the present case, although Brooks may have been regarded as a key prosecution witness at the start of the trial, his recantation on cross-examination of his earlier testimony implicating the defendant in the crime severely undermined his credibility and value as a witness for the state. In addition, much of his contradictory testimony during the state's relatively brief redirect examination was cumulative. For example, Brooks repeated his testimony, first given on direct examination, that he had agreed to facts in the plea representing that the defendant had participated in the robbery. He also testified, consistent with his testimony on cross-examination, that he had indicated before entering his plea that the defendant had not been present during the robbery. He further testified that the reason that he had agreed to the facts in the plea and had said what the prosecutor wanted to hear in a post-plea conversa-

tion was because he did not believe at the time that he would be called to testify against the defendant and lie. Accordingly, because a significant portion of Brooks' redirect testimony portrayed him as a reluctant witness for the state, it helped rather than harmed the defendant. Furthermore, as we discussed in part I of this opinion, the defense had ample opportunity to query Brooks regarding the issues raised on redirect examination because similar issues had been raised on direct and cross-examination. Finally, the state's case against the defendant was strong because two other accomplices and one of the victims testified that the defendant had participated in the robbery. See part II B 3 of this opinion. Consequently, it is highly unlikely that the jury would have been significantly influenced by Brooks' redirect testimony or by defense counsel's lack of an opportunity to recross-examine Brooks. In sum, not only was Brooks' redirect testimony substantially similar to his prior testimony, but its inconsistencies and contradictions emphasized his lack of credibility and the prosecutor's failed attempt to rehabilitate him as a witness for the state. Indeed, as the state has suggested, Brooks may have invoked the privilege against self-incrimination because he had become uncomfortable answering the prosecutor's questions that highlighted the irreconcilable contradictions in his prior testimony, thus exposing him to charges of perjury and jeopardizing his plea. We therefore conclude that, even if the trial court should have ordered Brooks to testify further, its failure to do so was harmless beyond a reasonable doubt.

### B

The defendant next claims as an alternative ground for affirmance that the prosecutor committed several improprieties that deprived him of a fair trial. The defendant specifically claims that the prosecutor became an unsworn witness through his direct and redirect examination of Brooks, that he personally vouched for the credibility of several witnesses during closing argument

and that these prosecutorial improprieties entitle him to a new trial. The state responds that, with one minor exception that was not prejudicial to the defendant, the prosecutor's examination of Brooks and his closing argument did not transform him into an unsworn witness. The state also counters that the prosecutor did not personally vouch for the credibility of any witness during closing argument. We agree with the state.

"We previously have recognized that a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77–78, 961 A.2d 975 (2009).

1

The defendant's first claim is that the prosecutor became an unsworn witness during his direct and redirect examination of Brooks when he referred to facts not in evidence regarding Brooks' out-of-court conversations with Judge Miano and the prosecutor, thus pitting his own credibility against that of Brooks and

injecting himself as a witness into the trial. The defendant specifically claims that the prosecutor queried Brooks in a manner suggesting that Brooks had been lying to the jury when he testified on direct and redirect examination that the defendant did not know about the impending robbery and was not present at the robbery but had been telling the truth to the prosecutor and Judge Miano when he implicated the defendant in the robbery. The defendant also claims that the prosecutor continued to inject his own personal knowledge into the case without presenting any evidence during his closing argument to the jury. The state responds that an attorney does not become an unsworn witness merely because a question regarding a prior inconsistent statement suggests to the jury that such a statement was made. Furthermore, although the state concedes that the prosecutor made an improper comment during closing argument regarding the defendant's testimony on direct examination, it argues that that impropriety did not deprive the defendant of a fair trial. We agree with the state.

"A prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 735, 850 A.2d 199 (2004). "A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.) *State* v. *Williams*, 81 Conn. App. 1, 13, 838 A.2d 214, cert. denied, 268 Conn. 904, 845 A.2d 409 (2004). On the other hand, a prosecutor may introduce evidence of a prior inconsistent statement made by a witness to impeach the credi-

bility of the witness. See generally Conn. Code Evid. § 6-10.[15]

Our decision in *State* v. *Coney*, 266 Conn. 787, 835 A.2d 977 (2003), is directly on point. In that case, the defendant also claimed that the state's attorney improperly became an unsworn witness when he asked two witnesses about inconsistencies between their trial testimony and earlier statements that they had made to the state's attorney and the police.[16] Id., 815. We disagreed and concluded that the state's attorney did not become an unsworn witness because the use of prior inconsistent statements, whether written or oral, is permissible to impeach a witness under § 6-10 of the Connecticut Code of Evidence. Id., 815–16. "It was therefore proper for the state's attorney to question [the] wit-

[15] Section 6-10 of the Connecticut Code of Evidence provides: "Prior Inconsistent Statements of Witnesses

"(a) Prior inconsistent statements generally. The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness.

"(b) Examining witness concerning prior inconsistent statement. In examining a witness concerning a prior inconsistent statement, whether written or not, made by the witness, the statement should be shown to or the contents of the statement disclosed to the witness at that time.

"(c) Extrinsic evidence of prior inconsistent statement of witness. If a prior inconsistent statement made by a witness is shown to or if the contents of the statement are disclosed to the witness at the time the witness testifies, and if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, except in the discretion of the court. If a prior inconsistent statement made by a witness is not shown to or if the contents of the statement are not disclosed to the witness at the time the witness testifies, extrinsic evidence of the statement is inadmissible, except in the discretion of the court."

[16] In view of the fact that we treated the unsworn witness claim in *Coney* as one of prosecutorial impropriety, we reject the state's argument that such a claim is more properly regarded as one of unpreserved evidentiary error that should not be reviewed when, as in the present case, the defendant has failed to object at trial. Moreover, *State* v. *Rowe*, 279 Conn. 139, 900 A.2d 1276 (2006), on which the state relies, is distinguishable. In that case, the defendant's claim of prosecutorial impropriety related to the admission of testimony on direct examination that the defense had objected to for lack of a sufficient foundation but that the court had allowed. See id., 151. The prosecutor in *Rowe* later commented on the testimony during closing argument. Id., 151, 152. We concluded that "[a]rguing on the basis of evidence explicitly admitted for that purpose cannot constitute prosecutorial [impropriety]." Id., 152. Accordingly, the basis for the defendant's claim of error

nesses as to the inconsistencies in their statements. The fact that the prior statements involved the state's attorney himself [was] irrelevant." Id., 816; see also *State* v. *Thomas*, 110 Conn. App. 708, 722–24, 955 A.2d 1222 (prosecutor did not inject himself as witness by asking two witnesses about conversations that they had had with him during interviews that prosecutor conducted before trial), cert. denied, 289 Conn. 952, 961 A.2d 418 (2008).

Presented with similar facts, we also conclude that the prosecutor did not become an unsworn witness when he queried Brooks during his direct and redirect examination. He simply followed the procedure set forth in the Code of Evidence by first asking Brooks if he recalled telling him and Judge Miano that the defendant had known about and participated in the robbery and then asking about the possible inconsistencies between those statements and his other testimony on direct and cross-examination. Merely asking Brooks to explain an inconsistency in his testimony was not the equivalent of giving testimony as an unsworn witness. See id., 724 (fact that prosecutor referred to prior conversation with witness during examination of witness, without more, did not render prosecutor unsworn witness). That Brooks may have made the inconsistent statements to Judge Miano and the prosecutor, rather than someone else, is of no consequence in these circumstances. See *State* v. *Coney*, supra, 266 Conn. 815–16.

In pressing his unsworn witness claim, the defendant relies on cases from several other jurisdictions. See, e.g., *United States* v. *Cardarella*, 570 F.2d 264, 267 (8th Cir.), cert. denied, 435 U.S. 997, 98 S. Ct. 1651, 56 L. Ed. 2d 87 (1978); *United States* v. *Puco*, 436 F.2d 761, 762 (2d Cir. 1971); *United States* v. *Block*, 88 F.2d 618, 620 (2d Cir.), cert. denied, 301 U.S. 690, 57 S. Ct. 793,

in *Rowe*, unlike in the present case, was essentially evidentiary in nature. See id., 151–52.

81 L. Ed. 2d 1347 (1937); *United States* v. *Washington,* 263 F. Sup. 2d 413, 430 (D. Conn. 2003); *Holt* v. *Commonwealth,* 219 S.W.3d 731, 734, 737–38 (Ky. 2007). Apart from the fact that some of the cited cases are factually distinguishable, there is no suggestion that the out-of-court statements in those cases were admissible for impeachment purposes under an evidentiary rule similar to § 6-10 of the Connecticut Code of Evidence. In fact, none of the cases addresses whether the statements could have been admitted as prior inconsistent statements to impeach the credibility of a witness. Accordingly, the foregoing cases provide no guidance in the present context.

With respect to the defendant's claim regarding the prosecutor's reference to unsworn witness testimony during closing argument, the following additional facts are relevant to our resolution of this claim. During closing argument, the prosecutor sought to downplay the inconsistencies in Brooks' testimony stemming from the recantation of his earlier testimony by emphasizing portions of his testimony that were consistent. The prosecutor first argued that Brooks had implicated the defendant in the robbery when he testified that he had seen the defendant pick up and examine a wallet that had been thrown on the ground, an incident that allegedly occurred during the robbery. He next argued that Brooks had implicated the defendant on the day that he entered his plea when Judge Miano asked him to tell him truthfully what had occurred. He finally argued that Brooks had implicated the defendant in the robbery in his conversation with the prosecutor in the presence of his own attorney and that Brooks' testimony on all three occasions had been reliable.[17]

---

[17] The prosecutor argued: "Mr. Brooks was consistent in saying that, at least at some time, he saw [the defendant] picking up a wallet, going through it and retaining that wallet. I suggest to you that's [the victim's] wallet that he picked up as part of what occurred that evening.

"And it's also consistent, I suggest to you, with what Mr. Brooks told Judge Miano the day he entered his plea on January 27 of 2005, when Judge Miano said, 'truthfully tell me what occurred.' And he indicated to Judge

For the same reasons that we concluded that the prosecutor did not become an unsworn witness when he questioned Brooks on direct and redirect examination, we conclude that the prosecutor did not inject his own personal knowledge into the case during closing argument when he referred to Brooks' testimony that he had seen the defendant pick up a wallet during the robbery and that he had complied with Judge Miano's request at the plea hearing to tell him truthfully what had happened during the robbery. The prosecutor properly questioned Brooks about these matters on direct and redirect examination to demonstrate the inconsistencies in his prior testimony and to establish that Brooks had affirmed his agreement with the facts that formed the basis for his plea. Consequently, the prosecutor's reference to the challenged testimony during closing argument also was not improper.

The state concedes, however, that the prosecutor improperly characterized Brooks' testimony on direct examination regarding his prior out-of-court conversation with the prosecutor. Although the prosecutor asked Brooks several questions on direct examination concerning the defendant's knowledge of the impending robbery, Brooks repeatedly evaded answering the questions by stating that he did not recall telling the prosecutor that the defendant had known about the robbery. Accordingly, in the absence of an admission or any other evidence establishing that Brooks had stated otherwise, the prosecutor improperly referred in his closing argument to Brooks' alleged testimony that he had told the prosecutor in their out-of-court conversation that the defendant had known about the robbery. To

Miano, at that time, that, at least he saw [the defendant] doing that as part of this . . . enterprise that each of them was a participant in.

"And, again, I suggest to you, I asked him, that was also consistent with what he told [me] and [the inspector] in the presence of his attorney when we were preparing for him to testify for the trial. And we suggest that, based [on] . . . that testimony and those representations to Judge Miano and us that that is reliable testimony . . . ."

this extent, the defendant correctly asserts that the prosecutor's closing argument was improper.

2

The defendant's second claim of prosecutorial impropriety is that the prosecutor vouched for the credibility of Brooks and two other witnesses during closing argument when he declared that (1) Brooks had been truthful during the plea hearing when he told Judge Miano that the defendant had been involved in the robbery, and (2) the testimony of two other witnesses who had participated in the robbery had been truthful. The state responds that the prosecutor did not vouch for the credibility of the witnesses during closing argument but properly interpreted the evidence. We agree with the state.

With respect to the claim regarding Brooks, the prosecutor asked Brooks on redirect examination if he had told the truth to Judge Miano during the plea hearing. When Brooks replied that he had not lied but that the defendant "wasn't there," the prosecutor asked: "Are you saying that you lied to Judge Miano when you told him, during the course of your plea, truthfully, when he asked you [whether the defendant] was present, [whether the defendant] got out of the vehicle . . . and, in fact, took a wallet that was tossed over to him and took that wallet and went in the van? Is that a lie that you told to Judge Miano?" Brooks replied: "That's what I agreed upon." During his rebuttal argument, the prosecutor responded to defense counsel's suggestion that he had pressured Brooks into implicating the defendant in the robbery by referring to an exchange with Brooks on redirect examination in which Brooks conceded that he had not spoken to the prosecutor "until after he had a plea, until after he told Judge Miano, truthfully, that [the defendant] was involved and [the defendant] picked up the wallet."

"[Although a] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 43, 917 A.2d 978 (2007). "Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 462, 832 A.2d 626 (2003).

We conclude that the prosecutor's comments were not improper. In referring to Brooks' admission that he did not speak to the prosecutor "until after he had a plea, until after he told Judge Miano, truthfully, that [the defendant] was involved and [the defendant] picked up the wallet," the prosecutor was not personally vouching for Brooks' credibility but, rather, was commenting on Brooks' own testimony on direct and redirect examination that he had understood his obligation to tell the truth to Judge Miano, that he had not lied to Judge Miano and that he had agreed to the factual basis for his plea.

With respect to the defendant's claim regarding the other two witnesses, the prosecutor reminded the jurors during closing argument that (1) they had heard testimony that Cromwell and Wallace had cooperated with the police immediately after their arrest, and (2) the information that Cromwell and Wallace had given

to the police concerning certain aspects of the robbery was consistent with the testimony of the police officer who first spotted them and ordered that they pull their van over to the side of the road. The prosecutor then argued: "So, I suggest to you [that] Mr. Cromwell and Mr. Wallace gave it up. They were truthful in testifying. They were truthful at the time that they had spoke[n] to the police. But that's for you to decide. That's just a factor for you to consider, that that's what they told the police at the time; that's what they did with the police."

Insofar as the prosecutor argued that Cromwell and Wallace "gave it up" and were "truthful" in testifying at trial and in their pretrial conversations with the police, the prosecutor was not vouching for their credibility. He merely was "suggest[ing]" that the two witnesses were truthful in testifying at trial because they previously had admitted to their guilt and had cooperated with the police. Moreover, the prosecutor was careful to add that it was for the jurors to decide whether the witnesses had been truthful, and that their cooperation with the police was just one factor to consider in assessing credibility. Accordingly, the prosecutor's comments regarding Cromwell and Wallace during closing argument were not improper.

3

Because the prosecutor committed one impropriety during closing argument, we must determine whether that impropriety deprived the defendant of his right to a fair trial. "The . . . determination of whether the defendant was deprived of his right to a fair trial . . . involve[s] the application of the factors set out by this court in *State* v. *Williams*, [supra, 204 Conn. 540]. As [the court] stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impro-

priety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . .

"[T]he determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . [T]he fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of

a fair trial and whether, therefore, reversal is warranted." (Citations omitted; internal quotation marks omitted.) *State* v. *Gould,* supra, 290 Conn. 78–79.

We conclude that the defendant was not deprived of his right to a fair trial as a consequence of the prosecutor's improper argument. Although the argument was not invited by the defense and was related to the central issue of whether the defendant had knowledge of the imminent robbery, other factors militate strongly in favor of the state. Most significantly, Brooks' overall credibility was severely damaged when he perjured himself on cross-examination by recanting his earlier testimony implicating the defendant in the crime. Furthermore, Cromwell and Wallace provided consistent testimony against the defendant. Consequently, the prosecutor's improper reference to Brooks' testimony was likely to have been discounted or disregarded entirely by the jurors.

In addition, the impropriety was the only such error committed by the prosecutor, represented a very small portion of his closing remarks and cannot be considered severe under *Williams.* Moreover, the trial court's failure to give a curative instruction was offset by the fact that the defense did not request one. As we previously have noted, "[w]hen defense counsel does not object . . . [or] request a curative instruction . . . he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) Id., 79. The court, however, did give general instructions of a mitigating nature that the statements and questions of the trial attorneys were not to be considered evidence and that it was the jury's responsibility to find the facts and determine the credibility of the witnesses.

Lastly, the state's case against the defendant was strong. Cromwell and Wallace both testified against the defendant, and one of the victims also identified the defendant as a participant in the robbery. Brooks him-

self gave testimony on direct examination and at the beginning of cross-examination implicating the defendant in the robbery. Consequently, the improper argument relating to Brooks' out-of-court conversation with the prosecutor was not significant in the context of the entire trial. We therefore reject the defendant's second alternative ground for affirmance because the prosecutorial impropriety was not so serious as to deprive the defendant of a fair trial.

C

The defendant claims that the Appellate Court's judgment also may be affirmed on the ground that the trial court failed to give a jury instruction on accomplice testimony. The defendant claims that the court's general instructions on credibility were not sufficient to alert the jurors that special consideration is required when accomplice testimony is given and that, in the absence of such an instruction, the jury had no way of knowing that it should view the testimony of Brooks, Cromwell and Wallace, the state's key witnesses, with caution. The defendant acknowledges that defense counsel did not request an instruction on accomplice testimony and that the lack of an instruction is not a violation of a constitutional right. The defense also did not take exception to the trial court's failure to give such an instruction. The defendant thus seeks review under the plain error doctrine. See Practice Book § 60-5. The state responds that the defendant has not met his burden of demonstrating harm under the plain error doctrine. We agree with the state.

The following additional facts are relevant to our resolution of this claim. During the state's direct examination of Cromwell, Wallace and Brooks, each witness was queried regarding his respective plea agreement. The state elicited testimony that all three witnesses had agreed to provide information to the state regarding the robbery, nothing had been promised in exchange for this information, the witnesses had not been asked

to testify in any particular way, and the only understanding was that the witnesses would tell the truth as to what had occurred.

Cromwell further testified on direct examination that no one had made any representations as to what his sentence would be when he entered his plea. Brooks testified that he had accepted a sentence of twenty years imprisonment, suspended after eleven years, and five years probation when he entered his plea, and Wallace testified that the court had indicated, at the time he entered his plea, that he would receive a sentence of fourteen years, suspended after seven years, and five years probation, with the right to argue for less. Brooks also testified that he had a lengthy criminal history and initially had lied to the police about his name. Wallace added that, at the time of his plea, he had been on probation for second degree assault.

On cross-examination, defense counsel asked Cromwell and Wallace whether they had expected to obtain lesser sentences when they entered their pleas and agreed to testify at trial. Both reiterated that they had received no such promises. Cromwell explained that his only expectation was that the process would be fair, and Wallace answered in the affirmative when defense counsel asked if he hoped that he would be helped by his testimony at trial.

At the end of her closing argument, defense counsel argued that the jurors had heard from at least two witnesses who had taken part in the robbery and that they believed that their trial testimony might influence their ultimate sentence, although the state had not made any promises to that effect. Defense counsel contended that Brooks, in particular, had been trying to balance what he claimed was his initial truthful statement that the defendant had not been involved in the robbery with his need to cooperate with the prosecutor in order to obtain a lesser sentence. Defense counsel then argued: "I ask whether that combination of circum-

stances doesn't, at least, give you a reasonable doubt as to whether or not [the defendant] was present at [the crime scene], whether [the defendant] participated in the robbery. And if you have a doubt remaining in your mind after considering all of the facts and all of the law and that doubt is a reasonable one, then you must bring in a verdict of not guilty."

In his rebuttal argument, the prosecutor referred to the fact that Wallace and Cromwell had cooperated immediately after they were stopped by the police, had been spoken to independently of one another and had given the same description of what had happened, including where Brooks dropped off the gun. The prosecutor then stated: "Now, you've heard about the plea bargain offers, and that's true, the state did not make those offers; that was done by the court." The prosecutor noted that each of the witnesses had admitted to his own involvement in the robbery and testified as to what had happened with the expectation that Judge Miano and the court would decide on a fair plea arrangement. As a result, Brooks had agreed to accept the offer, admit his involvement and testify truthfully at trial. The prosecutor reiterated that the state was not involved in the offer and that the offer had not been made with the expectation of any particular testimony.

The trial court later instructed the jury on credibility. The court did not refer to Cromwell, Wallace and Brooks specifically in its credibility instructions but advised the jurors that they were responsible for deciding which testimony to believe or to discredit and the weight that it should be given. The court further instructed that, in making these decisions, the jurors could consider a number of factors, including whether the witness had "an interest in the outcome of [the] case or any bias or prejudice concerning any party or any matter involved in the case . . . ." Shortly after that instruction, the court repeated that, in weighing the testimony of the witnesses, the jurors could con-

sider "any interest, bias, prejudice, sympathy or lack
of interest, bias, prejudice or sympathy which a witness
may apparently have for or against the state or the
accused or in the outcome of the trial."

We begin by setting forth the principles that govern
plain error review. "An appellate court addressing a
claim of plain error first must determine if the error is
indeed plain in the sense that it is patent [or] readily
discernable on the face of a factually adequate record,
[and] also . . . obvious in the sense of not debatable.
. . . This determination clearly requires a review of the
plain error claim presented in light of the record.

"Although a complete record and an obvious error
are prerequisites for plain error review, they are not,
of themselves, sufficient for its application. Plain error
review is reserved for truly extraordinary situations [in
which] the existence of the error is so obvious that it
affects the fairness and integrity of and public confi-
dence in the judicial proceedings. . . . Thus, in addi-
tion to examining the patent nature of the error, the
reviewing court must examine that error for the griev-
ousness of its consequences in order to determine
whether reversal under the plain error doctrine is appro-
priate. . . . [A]n appellate court addressing an appel-
lant's plain error claim *must* engage in a review of the
trial court's actions and, upon finding a patent error,
determine whether the grievousness of that error quali-
fies for the invocation of the plain error doctrine and
the automatic reversal that accompanies it.[18] . . .

"We next turn to a closer examination of the plain
error doctrine itself. This doctrine, codified at Practice

---

[18] Thus, the state's claim that plain error review is inapplicable in cases
in which the court ultimately finds harmless error reflects a misunder-
standing of the law. See, e.g., *State* v. *Brown*, 187 Conn. 602, 613–14, 447
A.2d 734 (1982); *State* v. *Taheri*, 41 Conn. App. 147, 154–55, 675 A.2d 458,
cert. denied, 237 Conn. 931, 677 A.2d 1374 (1996). A claim of plain error
first requires a determination of whether an error has occurred and, upon
finding error, a determination as to whether the error resulted in manifest
injustice such that the judgment must be reversed. See, e.g., *State* v. *Myers*,
290 Conn. 278, 288–89, 963 A.2d 11 (2009).

Book § 60-5,[19] is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 287–89, 963 A.2d 11 (2009).

In the present case, the defendant claims that the trial court improperly failed to instruct the jury on accomplice testimony. "Generally, a defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. . . . An exception to this rule, however, involves the credibility of accomplice wit-

---

[19] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

nesses. . . . [When] it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if [he or she] assisted or aided or abetted in the commission, of the offense with which the defendant is charged. . . . [I]n order for one to be an accomplice there must be mutuality of intent and community of unlawful purpose." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 227, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

"With respect to the credibility of accomplices, we have observed that the inherent unreliability of accomplice testimony ordinarily requires a particular caution to the jury [because] . . . [t]he conditions of character and interest most inconsistent with a credible witness, very frequently, but not always, attend an accomplice when he testifies. When those conditions exist, it is the duty of the [court] to specially caution the jury." (Internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 468, 886 A.2d 777 (2005). Moreover, because "an instructional error relating to general principles of witness credibility is not constitutional in nature . . . the defendant bears the burden of establishing that the error deprived him of his due process right to a fair trial." (Citation omitted.) Id., 471–42.

Mindful of these principles, we conclude that there was "plain" or "readily discernable" error. (Internal quotation marks omitted.) *State* v. *Myers*, supra, 290 Conn. 287. The parties agree that Cromwell, Wallace and Brooks were accomplices in the robbery who testified as witnesses for the state. It is also undisputed that the trial court failed to instruct the jury on accomplice testimony. Accordingly, the trial court did not satisfy its obligation to give a cautionary instruction, and we must determine whether this is one of those truly extraordinary situations in which the error was so harm-

ful that a failure to reverse the judgment would result in manifest injustice. Id., 289.

In *State* v. *Ruth*, 181 Conn. 187, 199–200, 435 A.2d 3 (1980), in which the defendant raised a similar claim, we considered several factors in determining whether the trial court's failure to give a cautionary instruction deprived the defendant of his right to a fair trial. These factors included whether (1) the accomplice testimony was corroborated by substantial independent evidence of guilt, (2) the accomplice testimony was consistent, (3) the accomplices' potential motives for falsifying their testimony were brought to the jury's attention, and (4) the court's instructions to the jury suggested that the witnesses might have an interest in coloring their testimony. Id.; see also *State* v. *Brown*, 187 Conn. 602, 613–14, 447 A.2d 734 (1982); *State* v. *Taheri*, 41 Conn. App. 147, 154–55, 675 A.2d 458, cert. denied, 237 Conn. 931, 677 A.2d 1374 (1996).

Applying these factors in the present case, we conclude, first, that the accomplice testimony was corroborated by substantial independent evidence of the defendant's guilt. Although the seven victims testified that their attention during the robbery was focused almost exclusively on the gunman, four testified that at least three men, none of whom was the driver, exited from the passenger side of the van when it pulled up beside them in the parking lot.[20] In addition, one victim identified the defendant from a photographic array, although he thought that the defendant had been the driver. The police likewise identified the defendant as one of the men in the van when it finally came to a stop after a high speed chase.

The second factor also favors the state. Although Cromwell and Wallace disagreed on certain minor details, their testimony was consistent on the principal

[20] Of these five witnesses, one witness said two or three men exited the van, three witnesses said three men exited the van, and one witness said three or four men exited the van. See footnote 4 of this opinion.

point that the defendant had participated in the robbery. The fact that Brooks testified on direct examination that the defendant had been present during the robbery and then recanted that testimony on cross-examination casts serious doubt on the reliability of *any* of his testimony and, therefore, neither adds to nor detracts from the consistent testimony of Cromwell and Wallace.

With respect to the third factor, namely, whether the potential motives of the accomplices for falsifying their testimony were brought to the jury's attention, all three accomplices were questioned thoroughly on direct and cross-examination regarding their plea agreements, whether they had promised to testify in any particular way, their respective understandings that they were expected to tell the truth and whether they anticipated more lenient sentences in exchange for their testimony. Brooks further testified that he had a lengthy criminal history and had lied to the police about his name when he initially was questioned, and Wallace testified that he was on probation for second degree assault when he entered his plea. In addition, defense counsel contended during closing argument that Brooks and Cromwell believed that their trial testimony might influence their ultimate sentences and that this consideration militated against finding the defendant guilty. The prosecutor responded during his rebuttal argument that the state had not been involved in the plea bargains and that there had been no expectation that Cromwell, Wallace and Brooks would testify in any particular way. In sum, both sides queried the accomplices in such a manner that their credibility was placed before the jury as a major issue in the case.

The only factor weighing in the defendant's favor is the omission of a specific jury instruction suggesting that Cromwell, Wallace and Brooks might have a special interest in testifying against the defendant. The court instead gave a standard, general instruction to consider the biases of witnesses in weighing credibility. Although

the instruction twice referred to the fact that the jurors could consider whether any of the witnesses had an interest in the outcome of the case or in any particular party, it did not refer to the witnesses by name or specifically caution that a plea deal might have affected their testimony. We nonetheless conclude that the four factors articulated in *Ruth*, when considered together, weigh in favor of the state and that the defendant has not met his burden of establishing that the lack of a cautionary instruction was so prejudicial that it deprived him of his right to a fair trial under the plain error doctrine. See *State* v. *Brown*, supra, 187 Conn. 613–14 (failure to give accomplice instruction harmless under plain error doctrine because jury was made aware of possibility of witness' personal interest in outcome of case during cross-examination, accomplice testimony was corroborated by testimony of other witnesses and state presented overwhelming evidence of defendant's guilt); *State* v. *Taheri*, supra, 41 Conn. App. 154–55 (failure to give accomplice instruction harmless under plain error doctrine because court instructed jury that witness' felony conviction and interest in outcome of case were factors that jury could weigh in assessing credibility of witness, there was no indication that accomplices had fabricated accounts of defendant's involvement in robbery, testimony of accomplices and their statements to police were consistent and nothing in record suggested any accomplice witness received promise of leniency for testimony against defendant).

The defendant argues that the present case is similar to *State* v. *Patterson*, supra, 276 Conn. 464, in which the trial court declined the defendant's request for a special credibility instruction regarding the testimony of a jailhouse informant. In that case, we analogized the requested instruction to an instruction on accomplice testimony and concluded that, although the informant had testified on direct and cross-examination that he had been promised certain benefits by the state in exchange for his cooperation against the defendant, the

error was harmful. Id., 472–73. We specifically concluded that the court's instructions on credibility were not extensive and contained no specific reference to the witness, the witness' testimony was not corroborated by substantial, independent evidence and the witness' testimony was extremely important to the state's case because, in its absence, the jury could not have found the defendant guilty. Id. We further emphasized that the last two factors were the most significant. Id., 473.

We conclude that *Patterson* is distinguishable from the present case. We first note that the claim in *Patterson* was not reviewed under the plain error doctrine because the defendant in that case, unlike the defendant in the present case, had requested a cautionary instruction that the court declined to give. See id., 464–65. Thus, the standard of review was not as demanding because the court was not required to conclude that the error was so clear and harmful that reversal was required to avoid manifest injustice. See, e.g., *State* v. *Myers*, supra, 290 Conn. 289. Second, unlike in the present case, there was no substantial, independent evidence in *Patterson* implicating the defendant in the crime. *State* v. *Patterson*, supra, 276 Conn. 473. In the present case, even without the accomplice testimony, the positive identification of the defendant by one of the victims, the testimony by four victims that at least three men had exited the passenger side of the vehicle and the police identification of the defendant as one of the four men in the van that had the same license plate as the vehicle involved in the robbery provided independent evidence on which the jurors could have based a finding that the defendant was guilty of the crimes charged.

The defendant also relies on seven cases from other jurisdictions in support of his claim. Six of those cases, however, are factually distinguishable. See *United States* v. *Bernal*, 814 F.2d 175, 183–85 (5th Cir. 1987) (failure to give instruction was reversible error when

accomplice testimony was "uncorroborated and was not directly supported by unequivocal circumstantial evidence"); *United States* v. *Owens*, 460 F.2d 268, 269 (10th Cir. 1972) (failure to give instruction was plain error when accomplice testimony was only evidence directly implicating defendant in crime); *Anthony* v. *State*, 521 P.2d 486, 490–92 (Alaska 1974) (failure to give instruction was harmful error when only evidence placing defendant at scene of crime or demonstrating motive or guilty knowledge was accomplice testimony and conviction was unlikely without it); *People* v. *Montgomery*, 254 Ill. App. 3d 782, 791, 626 N.E.2d 1254 (1993) (failure to give instruction was not harmless error when evidence was close and accomplice was key government witness), appeal denied, 154 Ill. 2d 566, 631 N.E.2d 714 (1994); *People* v. *Hall*, 77 Mich. App. 528, 531–32, 258 N.W.2d 547 (1977) (failure to give instruction was harmful error when accomplice was key government witness and case involved credibility contest between defendant and accomplice); *State* v. *Ferguson*, 30 Ohio App. 3d 171, 173–74, 507 N.E.2d 388 (1986) (failure to give instruction was not harmless when court instructed that accomplice testimony was to be viewed same as other testimony and court prohibited testimony that accomplice was codefendant who had been granted immunity in exchange for testimony). The holding in the seventh case supports the state's position. See *United States* v. *Moore*, 700 F.2d 535, 536 (9th Cir. 1983) (failure to give instruction was not plain error when no instruction was requested). Accordingly, we are unpersuaded by the defendant's claim and reject the defendant's third alternative ground for affirmance.

The judgment of the Appellate Court is reversed and the case is remanded with direction to affirm the trial court's judgment.

In this opinion ROGERS, C. J., and KATZ and VERTE-FEUILLE, Js., concurred.

PALMER, J., dissenting. I agree with the Appellate Court that the trial court violated the confrontation clause rights of the defendant, Dan L. Moore, by declining to strike the testimony that the assistant state's attorney (prosecutor) had adduced during his redirect examination of James Brooks, the state's key witness, after the defense was prevented from recross-examining Brooks because of his invocation of his fifth amendment privilege against self-incrimination during redirect examination. See *State* v. *Moore*, 103 Conn. App. 1, 6, 926 A.2d 1058 (2007). I also agree with the Appellate Court that this impropriety constituted harmful error requiring a new trial. See id., 10–11. Accordingly, I respectfully dissent.

The undisputed facts and procedural history relevant to this issue are set forth in the majority opinion and require no repetition here. I turn, therefore, to the confrontation clause principles that are applicable when, as in the present case, a state's witness who has testified on direct examination asserts his fifth amendment privilege and refuses to answer questions on cross-examination. As this court previously has observed, "[i]f a defendant's cross-examination is restricted by the competing fifth amendment right of a witness, it may be necessary to strike the direct testimony of that witness." (Internal quotation marks omitted.) *State* v. *Roma*, 199 Conn. 110, 116, 505 A.2d 717 (1986). "To reconcile a defendant's rights under the confrontation clause with a witness' assertion of the fifth amendment privilege, a court must initially consider: (1) whether the matter about which the witness refuses to testify is collateral to his or her direct testimony, and (2) whether the assertion of the privilege precludes inquiry into the details of his or her direct testimony. . . . If the court determines that the privilege has been invoked with respect to a collateral matter, or that the invocation does not preclude inquiry into the witness' direct testimony, then the defendant's right to cross-examine has

not been impinged and no corrective action is necessary. Conversely, the sixth amendment is violated when a witness asserts the privilege with respect to a non-collateral matter and the defendant is deprived of a meaningful opportunity to test the truth of the witness' direct testimony."[1] (Citations omitted.) *Bagby* v. *Kuhlman*, 932 F.2d 131, 135 (2d Cir.), cert. denied, 502 U.S. 926, 112 S. Ct. 341, 116 L. Ed. 2d 281 (1991). I believe that Brooks' invocation of his fifth amendment privilege during his redirect examination by the prosecutor precluded the defense from recross-examining him on matters that were not collateral and prevented the defense from meaningfully probing the testimony that Brooks had given on redirect examination.

For the reasons set forth by the Appellate Court, I agree with its conclusion that the issues that the prosecutor raised during its redirect examination of Brooks were not collateral matters. See *State* v. *Moore*, supra, 103 Conn. App. 8. The facts surrounding Brooks' agreement to enter into a plea deal with the state and, in particular, the facts relevant to his agreement to testify that the defendant had participated in the robbery, as well as the reason or reasons for his subsequent change in his testimony on cross-examination, were key to the jury's assessment of Brooks' credibility. Because Brooks offered two different and conflicting versions of the events on the night of the robbery—one version, which the prosecutor elicited on direct examination,

[1] The state correctly notes that another aspect of the inquiry for determining whether a defendant's right of confrontation has been violated involves consideration of the quality of the entire cross-examination. It is true that the defense in the present case was afforded a full opportunity to cross-examine Brooks following his direct examination, including an opportunity to inquire generally about Brooks' plea agreement with the state. As I explain more fully hereinafter, however, the defense was denied an opportunity to question Brooks with respect to the detailed testimony about the plea agreement that the state had elicited from Brooks on redirect examination. Consequently, the overall quality of defense counsel's cross-examination of Brooks was lacking—through no fault of the defendant, who could not possibly have foreseen that Brooks would invoke his fifth amendment privilege during his redirect examination by the state.

that implicated the defendant in the robbery, and a second version, which the defense elicited on cross-examination, that vindicated the defendant of any such involvement—the defendant's guilt hinged on which version the jury accepted. Thus, as the Appellate Court observed, "[t]he details of Brooks' plea agreement, which included a promise to testify against the defendant and a recitation of the facts to which he would testify, bore directly on the truthfulness of the testimony, not on his general character or credibility. Conversations with the prosecutor about going to trial also dealt directly with the truth of Brooks' testimony. This testimony was not collateral evidence of *general* bias because it explored more than *general* credibility." (Emphasis added.) Id., 8–9. In other words, Brooks' testimony on redirect examination did not pertain to collateral matters because that testimony bore on Brooks' credibility in relation to the central issue in the case, that is, whether the defendant had been a knowing participant in the robbery.

The inability of the defense to recross-examine Brooks concerning the information that the prosecutor had elicited on redirect examination also deprived the defense of the opportunity to focus its questioning of Brooks on the issue of how and why he came to enter into his plea agreement with the state and his reasons for telling the state, in connection with the plea negotiations, that the defendant had been involved in the robbery. During direct examination, Brooks equivocated somewhat on the details of how the robbery took place, prompting the prosecutor to elicit testimony from Brooks concerning the fact that the information about the defendant that Brooks had provided to the state indicated that the defendant was, in fact, a participant in the robbery. At this point, however, Brooks' testimony comported with the statements that he had made about the defendant during his pretrial discussions with the state, that is, that the defendant was involved in the robbery. On cross-examination, Brooks testified that

he originally had told the state that the defendant was not involved in the robbery but that later, during the course of plea discussions, he had stated that the defendant did participate in the crime. Although, on cross-examination, Brooks initially reaffirmed his testimony on direct examination that the defendant had participated in the robbery, Brooks later changed his testimony and explained that the defendant was not involved in the crime and, further, that his earlier direct and cross-examination testimony to the contrary was the product of pressure by the state related to his plea discussions. On redirect examination, the prosecutor questioned Brooks in much greater detail concerning the facts to which he had agreed in certain statements that he had made before Judge Miano, who presided over the hearing at which Brooks entered his guilty plea pursuant to his plea agreement with the state. In particular, the prosecutor elicited testimony from Brooks that, during his appearance before Judge Miano, he had agreed to tell the truth and, further, that, at that time, he had implicated the defendant in the robbery.

In eliciting Brooks' testimony on redirect examination, the prosecutor attempted to call into question his testimony on cross-examination that the defendant was *not* present during the robbery, essentially asking the jury to infer that Brooks' recantation on cross-examination was not credible. It is this issue—the credibility of Brooks' statements on cross-examination that the defendant was not present at the time of the robbery— that the prosecutor focused on, for the first time, during his redirect examination of Brooks, and that the defense had no meaningful opportunity to probe. Until the prosecutor had undertaken his more thorough questioning of Brooks on redirect examination about Brooks' discussions with the state and his representations to Judge Miano, the defense had no cause or reason to explore those matters. Only after Brooks expressly had abandoned his original inculpatory testimony regarding the defendant's involvement in the robbery did the prosecu-

tor attempt to discredit that recantation, and only then could the defense effectively have cross-examined Brooks on that point. Because the defense was not afforded an opportunity to address the prosecutor's efforts on redirect examination to discredit the testimony that Brooks had given on cross-examination, it cannot be said that the defense was "permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness."[2] (Internal quotation marks omitted.) *State* v. *Brown*, 273 Conn. 330, 340, 869 A.2d 1224 (2005).

Indeed, the majority's conclusion that the defense, during its cross-examination of Brooks, was obligated to pose any and all questions to him that related to his change in testimony—lest Brooks refuse to testify before any potential recross-examination—effectively required the defense to perform the very impeachment that the prosecutor performed on redirect examination so that the defense could preemptively rehabilitate the exculpatory testimony elicited on cross-examination. At the time of cross-examination, however, the defense obviously had no way of knowing either that Brooks would invoke his fifth amendment privilege prior to recross-examination or that the prosecutor necessarily would elect to engage in redirect examination of Brooks. At that point, therefore, the defense had no

---

[2] I disagree with the majority that *United States* v. *Caudle*, 606 F.2d 451 (4th Cir. 1979), on which the defendant relies in support of his claim, is distinguishable from the present case. In *Caudle*, the United States Court of Appeals for the Fourth Circuit concluded that the District Court improperly had denied the request of the defendants in that case to recross-examine one of the government's witnesses. Id., 456, 459. In so concluding, the Court of Appeals reasoned that, because the government's redirect examination had required the witness to testify in significantly greater detail concerning information that had been the subject of the witness' direct examination testimony, the defendants had a sixth amendment right to question the witness on those details. Id., 459. The Court of Appeals reached this conclusion even though the defendants theoretically could have engaged in such detailed questioning of the witness on cross-examination. Like in *Caudle*, I believe that the redirect examination testimony in the present case concerned new matters about which the defendant had a sixth amendment right to question Brooks.

incentive to engage in an in-depth examination of Brooks' changed testimony.

I agree that defense counsel's decision to refrain from cross-examining Brooks on his apparent equivocation during direct examination concerning the defendant's involvement in the crime could be viewed as a form of "trial strategy," which ordinarily forecloses any claim of a violation of the right of confrontation. See, e.g., *State* v. *Reed*, 174 Conn. 287, 300, 386 A.2d 243 (1978) ("[w]hen a party chooses not to cross-examine a witness in order to avoid the possibility of eliciting harmful testimony, his right to confront and cross-examine that witness as guaranteed by the sixth and fourteenth amendments of the United States constitution is in no way abridged" [internal quotation marks omitted]). Whether a defendant may be deemed to have had a meaningful opportunity to cross-examine a witness about a particular matter, however, necessarily depends on whether that defendant had any reason or basis to do so at the time. As I have explained, the defense in the present case had no such reason prior to the prosecutor's questioning of Brooks on redirect examination. To conclude otherwise would place an unfair burden on a defendant to interrogate a witness about any possibly relevant issue irrespective of the fact that such questioning may prove to be completely unnecessary or even counterproductive, depending on how the prosecutor proceeds, if at all, during his or her redirect examination of that witness. In the present case, the defense had every reason, and every right, to refrain from delving into the details of Brooks' plea arrangement with the state until considering the manner and extent to which the prosecutor addressed that issue during his redirect examination of Brooks.[3]

---

[3] The state also contends that it would have been unfairly prejudiced if the trial court had stricken Brooks' redirect examination testimony. I disagree with this claim. Although it is true that striking Brooks' redirect examination testimony effectively would have foreclosed the state from questioning Brooks about the exculpatory testimony that he had given on

My conclusion that the trial court improperly declined to strike Brooks' redirect examination testimony requires a determination of whether that error was harmful. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends [on] a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

In the present case, I agree with the Appellate Court that the trial court's improper denial of the defendant's motion to strike Brooks' redirect examination testimony was not harmless beyond a reasonable doubt. See *State* v. *Moore,* supra, 103 Conn. App. 10–11. A review of the record reveals that the opportunity to rehabilitate Brooks following his testimony on redirect examination was potentially vital to the defendant's case. Recross-examination would have permitted the defense to elicit testimony from Brooks explaining why he had changed his story following direct examination and the first part of cross-examination, presumably by explaining the pressure that he felt from the state to implicate the defendant in the robbery. Because the identification of the defendant by the victims of the

cross-examination, that fact does not compel the conclusion that striking that testimony would have been *unfairly* prejudicial to the state. On the contrary, to the extent that the state suffers any prejudice because its own witness changes his story on cross-examination and thereafter refuses to testify, it is the state, and not the defendant, who must bear the risk that the witness will make himself unavailable in that manner. To conclude otherwise would reward the state for a decision that was solely within the

crime was not particularly reliable,[4] the testimony of Brooks, the person primarily responsible for initiating and carrying out the robbery, was critical, and recross-examination of Brooks reasonably could have placed in doubt the evidence implicating the defendant in the robbery.[5] Because the trial court's denial of the motion to strike Brooks' redirect examination testimony was both improper and harmful, I would affirm the judgment of the Appellate Court reversing the judgment of the trial court.[6]

discretion or control of its own witness and, at the same time, seriously jeopardize the defendant's right of confrontation.

[4] As the Appellate Court observed, "[o]f the seven victims who viewed photographic arrays, including the defendant's photograph on the night of the robbery, only one victim identified the defendant as an assailant. That victim stated that he thought [that] the defendant was the driver of the van, but this was inconsistent with all other evidence presented." *State* v. *Moore*, supra, 103 Conn. App. 11 n.6.

[5] I note that the majority's assertion that Brooks' redirect examination testimony lacks significance is undermined by the state's claim at trial that striking the testimony would have been unfairly harmful to its interests. Indeed, in essence, the state asserts that Brooks' testimony on redirect examination was too important to strike but not important enough to have prejudiced the defendant. In concluding both that the state was entitled to the benefit of Brooks' testimony *and* that the testimony was not significant, the majority effectively endorses this "heads I win, tails you lose" position. In contrast to the majority, I do not believe that the state can have it both ways.

[6] In my view, there is no question that the trial court should have stricken Brooks' redirect examination testimony and, therefore, that its refusal to do so was improper. If the trial court had granted the defendant's motion to strike, the defendant would have no sixth amendment claim—or any other reason to complain—because the defense would have been afforded a full and fair opportunity to cross-examine Brooks about his direct examination testimony. The state also would have no complaint because the prosecutor would have elicited the testimony that he needed from Brooks on direct examination. Furthermore, as I discussed previously; see footnote 3 of this opinion; because Brooks was the state's witness, striking his redirect examination testimony would not have been unfair to the state. Because there was no justification for the trial court's denial of the defendant's motion to strike the challenged testimony, it was an abuse of discretion not to do so. As I have explained, in my view, that abuse of discretion resulted in a violation of the defendant's right of confrontation.

The majority concludes, however, that the trial court's denial of the motion to strike Brooks' redirect examination testimony was not an abuse of discretion because, in the majority's view, that ruling did not result in a violation of the defendant's right of confrontation. See part I of the majority opinion ("[i]n light of our determination that there was no constitutional violation, there is no basis for concluding that the trial court abused its discretion in declining to strike Brooks' redirect [examination] testimony"). I disagree

Accordingly, I respectfully dissent.[7]

with the majority's analysis. Whether a trial court's evidentiary ruling constitutes an abuse of discretion does not depend on whether that ruling also results in a constitutional violation. In other words, an evidentiary ruling may constitute an abuse of discretion but not rise to the level of a constitutional violation. Indeed, that is generally the case when a trial court makes an improper evidentiary ruling. For purposes of its analysis, however, the majority improperly assumes that an evidentiary ruling that does not result in a confrontation clause violation also does not constitute an abuse of discretion. Because the majority fails to engage in a proper analysis of the propriety of the trial court's ruling, it also fails to engage in the harmless error analysis that is required when a trial court ruling amounts to an abuse of discretion. See, e.g., *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006) (improper evidentiary ruling that is not constitutional in nature is harmless only if reviewing court "has a fair assurance that the error did not substantially affect the verdict" [internal quotation marks omitted]), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008).

The majority explains that its failure to engage in this required analysis is predicated on the fact that "the parties did not address in their briefs to this court whether the trial court abused its discretion but confined their arguments to the constitutional question . . . ." Part I of the majority opinion. Although the parties focused primarily on the constitutional issue—the issue that the Appellate Court decided in favor of the defendant; see *State* v. *Moore*, supra, 103 Conn. App. 6—the state, in its brief to this court, also expressly argued that the trial court's denial of the defendant's motion to strike Brooks' testimony was harmless even if that ruling constituted an abuse of discretion that did not rise to the level of a constitutional violation. In any event, given the majority's conclusion that the Appellate Court decided the constitutional question improperly, it is only fair for this court also to address the issue that necessarily is subsumed in that broader constitutional issue, namely, whether the trial court's denial of the defendant's motion to strike, even if not a confrontation clause violation, nevertheless constituted an abuse of discretion and, if so, whether the impropriety warranted a new trial because it substantially affected the verdict.

[7] Because I would affirm the judgment of the Appellate Court on the ground that that court correctly concluded that the defendant's right of confrontation was violated, I need not address the defendant's alternative grounds for affirming the Appellate Court's judgment.